(June 2, 1988)

■ Shari Parker, Individually and as Administratrix of the Estate of Scott Parker, Deceased, Respondent, v D/U Third Realty Company et al., Appellants. (And a Third-Party Action.)—The order of the Supreme Court, New York County (William P. McCooe, J.), entered on or about June 30, 1987, which denied defendants' motion pursuant to CPLR 3212 for summary judgment dismissing the complaint, is reversed on the law and defendants' motion for summary judgment dismissing the complaint granted, without costs or disbursements.

The 25-year-old decedent, Scott Parker, was killed during a robbery which occurred in a parking lot owned by defendant D/U Third Realty Company and managed by defendant Split-Rock Realty Company, Inc. The crime was committed on August 30, 1983 after Diana Ortiz, a prostitute, and three male accomplices agreed that Ortiz would bring a "john" to defendants' parking lot so that the men could rob him. In accordance with the plan, Ortiz proceeded to Surf Avenue in Brooklyn, where she encountered the victim, Scott Parker, an off-duty Port Authority police officer assigned to Kennedy Airport. Ortiz later made a full statement to the police in which she described her encounter with Parker as follows: Parker inquired whether she was going out, and she replied that she was. She then got into his car, at which time he asked her how much she charged. She mentioned two specific sex acts and gave a fee for each. Ortiz claimed that she "felt bad vibes because the victim asked if she had coke." They thereupon drove to the parking lot and started talking. Ortiz further stated that:

"I wanted to get down to business because, you know, I work and I don't like to waste too much time with the one I'm

with. But he wanted to talk, so we started talking. And then some guys came up into the car, and they told us to stay still. That nobody's gonna get hurt.

"At this time T [Thomas Padilla, one of the accomplices] approached the passenger side window of the auto with a gun in his hand. He said don't move, nobody is going to get hurt, we only want your money. He opened the passenger side door".

Ortiz asserted that she then left the car and was running on 24th Street in the direction of Surf Avenue when she heard a single shot. Jeffrey Harper, one of the men who had earlier plotted with Ortiz, also confessed. He informed the police that following the decision to perpetrate a robbery, Ortiz was gone for about 15 minutes. According to Harper: "When she came back, she was in a maroon or orange car. The white man was driving, he was a white man with black hair. Tony walked up to the passenger side of the car. The girl was supposed to have the window rolled down. Tony stuck the gun in the car. The girl was supposed to make sure the trick turned the car off. Tony took her out of the car, he said 'You stupid bitch, don't be coming down here, give me the money he gave you.' Tony took some money from her, and she ran. The girl ran toward Ocean Tower on 24th Street. The other black dude was searching the white dude. I was just there to be the lookout. I think the white dude moved, that's when I heard the shot. I felt pain, and went right down."

Scott Parker was discovered slumped over the driver's seat of his vehicle He was taken to Coney Island Hospital where he died on September 5, 1983, never having regained consciousness. Both Ortiz and Harper were subsequently convicted of murder in the second degree (the other two perpetrators were also apprehended). The victim's widow, plaintiff Shari Parker, commenced the instant wrongful death action against defendants, alleging that they knew or, in the exercise of reasonable care, should have known that the parking lot was unsafe, that a number of criminal acts had taken place there, and, moreover, by not taking reasonable precautions to protect persons lawfully and properly on their premises and to whom they owed a duty of reasonable care, they had failed to maintain their property in a reasonable and safe condition. Defendants moved pursuant to CPLR 3212 for summary judgment dismissing the complaint, citing the recent ruling in *Waters v New York City Hous. Auth.* (69 NY2d 225) wherein the Court of Appeals held that the owner of an occupied urban building who has not kept the premises' security system

in good repair may not be held liable in tort solely because the building was used to complete a crime that began on a public street. In that regard, it is defendants' position that the crime against Scott Parker was initiated on Surf Avenue when Diana Ortiz, as part of a prearranged scheme, lured him to defendants' parking lot with the intention of having him robbed by her confederates.

In response, plaintiff urges that the evidence at trial will demonstrate that at the time of the incident, Parker was taking lawful and proper action as a police officer to effectuate the arrest of Diana Ortiz on prostitution or drug charges. She disputes defendants' assertion that the crime started outside of their premises, claiming, instead, that her husband drove with a suspected criminal offender to the location where he was killed in order to obtain evidence of a crime and to carry out other proper police action and that, at the time of his death, his shield was out, and he had shot one of the perpetrators. To support her contention that the deceased was killed while endeavoring to make an arrest, rather than in the course of a robbery, plaintiff attached a series of exhibits to her affidavit in opposition to defendants' motion for summary judgment. Among these items are a profile of Scott Parker prepared by the Port Authority attesting to his exemplary character; an interview of Jeannette Harper, Jeffrey Harper's mother, conducted by the police department, which, in plaintiff's view, raises questions of fact as to how Parker was killed; and a Port Authority memorandum in which the commanding officer of the Professional Standards Bureau states that he attended a meeting at the Law Department with the Superintendent of Police wherein it was determined that Parker's death "resulted from an injury on duty caused by police action during a robbery." In addition, plaintiff submitted an affidavit by John Rudden, a retired captain of the New York City Police Department, who had instructed students at the Police Academy with respect to the proper procedures to be used in making prostitution and narcotics arrests. Rudden therein declared that he had reviewed the motion papers and annexed exhibits, as well as the various investigation reports, and had concluded that:

"Diana Ortiz has given a number of contradictory statements as to the circumstances surrounding her meeting with the deceased police officer. However, a pattern is established herein that this young, enthusiastic, aggressive police officer was either (1) taking police action to assist a woman he believed to be in distress, or (2) he was taking police action in

order to effectuate an arrest for prostitution and/or violation of the narcotics law.

"I can state with a reasonable degree of police certainty that the conversation engaged in by Diana Ortiz and police officer Parker is the standard police technique used to effectuate a prostitution arrest in what is called a 'direct' case."

In denying the motion for summary judgment, the Supreme Court determined that "[p]laintiff should have the opportunity to establish that the version of the incident given by the perpetrators was false and that the deceased was actually seeking to effectuate an arrest of the female perpetrator. Furthermore even if defendants['] version of the facts is accepted, plaintiff should have the opportunity to establish that the status of the deceased on the premises had changed to that of a police officer performing his duty once he resisted the robbery and shot one of the perpetrators. It is doubtful the deceased would have been shot if he had not sought to perform his duty to apprehend the perpetrators. Policemen and foremen have traditionally been treated as business invitees since they benefit the owner by protecting his property." The court also discerned the existence of a factual issue as to whether the crime was sufficiently connected with defendants' parking lot. On appeal, defendants argue that they did not owe any duty to decedent to maintain their premises in a safe condition since he was enticed from a public street to the parking lot by a prostitute engaged in a criminal enterprise; that plaintiff's conclusory allegations are insufficient to defeat defendants' prima facie showing that they are entitled to summary judgment; and that Captain Rudden's affidavit should be disregarded as his conclusions are not based upon evidence in the record, but were patently tailored to meet the exigencies of the present lawsuit. There is merit to defendants' position.

Clearly, summary judgment is a drastic remedy which should not be invoked where there is any doubt as to the existence of a triable issue of fact *(Rotuba Extruders v Ceppos,* 46 NY2d 223) since its function is issue finding, not issue determination *(Double A Limousine Serv. v New York, N. Y. Limousine Serv.,* 130 AD2d 403). However, "when there is no genuine issue to be resolved at trial, the case should be summarily decided, and an unfounded reluctance to employ the remedy will only serve to swell the Trial Calendar and thus deny to other litigants the right to have their claims promptly adjudicated" *(Andre v Pomeroy,* 35 NY2d 361, 364). In the instant situation, the record does not support the

finding by the Supreme Court that there are triable questions of fact. On the contrary, the extensive documents submitted by defendants in connection with their motion for summary judgment, including police investigative reports, confessions, excerpts of trial testimony and the District Attorney's opening statement to the jury, as well as his summation, conclusively demonstrate that on August 30, 1983, Scott Parker was the victim of a brutal crime planned and implemented by Diana Ortiz and three associates. This crime was initiated not on defendants' property, but on Surf Avenue when Ortiz propositioned Parker, and he then drove with her, at her direction, to the parking lot where the criminal activity had its culmination. Under this fact pattern, there was no relationship whatever between the decedent and defendants, and defendants owed no duty to the decedent.

In *Waters v New York City Hous. Auth. (supra)*, a teen-age girl was walking on a public street, just outside a public housing project, when she was accosted by a man displaying a knife and forced into a nearby building, which was unlocked, after which she was taken to the roof, robbed and sexually assaulted. An investigator's affidavit supplied by plaintiff indicated that the front door locks on the building had been either broken or missing for at least two years prior to the incident, that several tenants had registered complaints about that condition and that there had been at least five crimes committed on the premises involving outsiders. Yet, the Court of Appeals, in affirming the granting of summary judgment to the owner of the building, the New York City Housing Authority, declared, in pertinent part *(supra,* at 229): "The risk to be reasonably apprehended in this instance is that of intrusion by outsiders with criminal motive who might do harm to those who have a right to feel at least minimally secure inside a dwelling place. Although it is argued that the duty to keep occupied residential premises secure also encompasses the risk that an unsecured building might become a safe haven for crime begun on the street, we cannot agree that the scope of a landowner's duty should be extended to embrace members of the public at large, with no connection to the premises, who might be victimized by street predators."

The court proceeded to note that while "strict notions of privity are not dispositive in defining the scope of a landowner's duty * * * in this case both logic and public policy weigh heavily in favor of confining the scope of defendant landowner's duty to protect against criminal acts to tenants and others who might reasonably be expected to be on the premises. An

important consideration in this context is the fact that the landowner has no control over either the acts of the primary wrongdoer or the conditions on the public byways that make such acts all too commonplace * * * Another significant factor is the virtually limitless liability to which defendant and other landowners would be exposed if their legal obligations were extended to plaintiff and to all others in her position" *(Waters v New York City Hous. Auth., supra,* at 230). Although a landlord is certainly required to take reasonable security measures to avoid the likelihood of injury to tenants *(Miller v State of New York,* 62 NY2d 506), business guests or invitees *(Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507), and may also be liable to other persons whose presence on the property is reasonably foreseeable, such as business patrons, delivery people and legitimate visitors, a property owner has no responsibility to extend that protection to "the millions of individuals who use the sidewalks of New York City each day and are thereby exposed to the dangers of street crime" *(Waters v New York City Hous. Auth., supra,* at 230).

Plaintiff's assertion that the deceased was attempting to effectuate the arrest of Diana Ortiz for prostitution and/or the sale of narcotics is based upon nothing more than speculation. Indeed, both the theory of the prosecution at the trial of Ortiz and Harper and the testimony thereat contradict plaintiff's hypothesis. Similarly, there is nothing in the record, notwithstanding Captain Rudden's conclusory allegations to the contrary, to show how an off-duty Port Authority police officer assigned to Kennedy Airport came to be taking police action on Surf Avenue in Brooklyn. Plaintiff also conjectures that Parker shot one of the perpetrators. Here, too, the available evidence belies this claim, since the proof establishes that only one shot was fired, the shot from the assailant's gun which entered Parker, severed his spinal cord, then exited his body and struck Jeffrey Harper. The law is well settled that a party cannot defeat a motion for summary judgment by general conclusory allegations which contain no specific factual references *(Poluliah v Fidelity High Income Fund,* 102 AD2d 720).

In the absence of any evidence, testimonial or documentary, that Parker's death occurred in any manner other than what the People advanced at the trial of Ortiz and Harper, and which was evidently accepted by the jury which convicted them, defendants' motion should have been granted. There can be no liability for a failure in security where, as here, the owner of the property has no relationship at all to either the wrongdoer or the victim, and there is no connection between

plaintiff's decedent and the premises independent of the crime itself *(Waters v New York City Hous. Auth., supra)*. Concur—Murphy, P. J., Sullivan, Milonas and Kassal, JJ.

Sandler, J., dissents in a memorandum as follows: The facts are fairly and comprehensively set forth in the court's memorandum opinion. Apparently assuming that the opinion of the Court of Appeals in *Waters v New York City Hous. Auth.* (69 NY2d 225) requires dismissal of the complaint if the factual presentation of the defendants is accepted as undisputed, the single issue addressed in the court's opinion, which was indeed the only issue raised by plaintiff on this appeal and addressed in the IAS court's opinion, is whether the affidavits submitted on behalf on the plaintiff raise a factual issue as to the reason that the deceased, Scott Parker, came to the parking lot in which he was killed during a robbery. Upon analysis, however, it is clear that the opinion in *Waters* does not require or support the dismissal of the complaint even if we accept as undisputed the facts presented by the defendants. Accordingly, I find it unnecessary to determine whether or not the different interpretation of events set forth by an expert witness in plaintiff's presentation independently gives rise to a factual issue precluding summary judgment dismissing the complaint, although if I were required to reach that issue, I would be inclined to think that it did.

An understanding of the principles set forth in *Waters (supra)* as applied to the facts in this case requires preliminarily a consideration of the landmark opinion of the Court of Appeals in *Basso v Miller* (40 NY2d 233). In *Basso,* the court reviewed the prior law in this State which had distinguished the duty of a landowner to others on the basis of the status of the injured person, and had established different principles of liability depending on whether the injured person was an invitee, licensee, or trespasser. The court *(supra,* at 241) "abandoned the classifications entirely and announced our adherence to the single standard of reasonable care under the circumstances whereby foreseeability shall be a measure of liability. To be sure, this standard of reasonable care should be no different than that applied in the usual negligence action. Contributory and, now, comparative negligence, as well as assumption of the risk, all fit into their respective places, to be invoked when appropriate." In short, as relevant to the facts in this case, *Basso* established as the law in this State that a landowner or occupier of property has a duty of reasonable care that extends even to a trespasser. Nothing in

the opinion in *Waters* can be fairly evaluated as modifying that principle.

As set forth in the *Waters (supra)* opinion, the plaintiff was walking on a public street when she was accosted by a man who displayed a knife and demanded that she walk with him to a building around the corner. Once inside the building, which was unlocked, the man forced her to the roof, and after taking her money, sodomized her. It was further asserted in an investigator's affidavit that the front door locks on the building had been either broken or missing for at least two years before the incident, and that several tenants had registered complaints about the condition over that two-year period.

The opinion in *Waters (supra,* at 227) set forth the issue presented, and the court's response to that issue, in the opening paragraph: "The issue in this appeal is whether the owner of an occupied urban building who has not kept the building's security system in good repair may be held liable in tort solely because the building was used to complete a crime that began on a public street. Under the circumstances of this case, where neither the victim nor the crime were connected with the defendant's building, we hold that plaintiff was not within the zone of foreseeable harm and that, as a consequence, liability cannot be imposed."

Although the defendants asserted in their appellate presentation that the crime with which we are here concerned began when the female member of the holdup group approached the deceased on a public street, and the court's memorandum opinion uncritically accepts that thesis, it is clear even from the facts submitted by the defendants that this interpretation of the incident is a radical distortion of what occurred. The crime in fact began on the defendants' parking lot where the several participants gathered and planned the crime that thereafter occurred. It was agreed in the plan concerted while the participants were on the defendants' parking lot that Diana Ortiz would leave them and attempt to bring a "john" to the parking lot so that the others could hold him up. She left the parking lot in pursuance of that plan, the other defendants remaining there to await her return. When she returned with the deceased to the parking lot he was there robbed, and during the robbery, shot and killed.

Manifestly, this is not a case in which a crime was commenced on a public street and thereafter completed on the defendants' property, nor is it a case in which it can be

asserted with any degree of reality that the crime was not connected from its inception with the defendants' property. In short, the limiting principle set forth in *Waters (supra)* is not applicable. The rule governing this case remains that set forth in *Basso v Miller (supra),* under which the owner of the parking lot was under a single duty of reasonable care under the circumstances. Significantly, defendants did not even dispute in their papers that the parking lot had been the scene of many previous criminal acts, and indeed confirmed that part of plaintiff's allegations in their third-party complaint against a security company which they had retained to provide protection.

I am aware that in several parts of the opinion in *Waters (supra)* there appears language which, if considered in isolation, could be read as more broadly limiting the liability of landlords to tenants and others lawfully on their property where injuries have been sustained as a result of a crime committed on the property. When those parts of the opinion are read in context, however, it seems improbable that the court intended to modify the fundamental principle set forth in *Basso v Miller (supra)* to so limit the scope of a landlord's liability to victims of crimes committed on the landlord's property.

Thus, the court's opinion *(supra,* at 229), observing that the duty allegedly breached—to maintain front door locks in working condition—exists primarily to protect the safety of tenants and visitors inside the premises, observed: "The risk to be reasonably apprehended in this instance is that of intrusion by outsiders with criminal motive who might do harm to those who have a right to feel at least minimally secure inside a dwelling place." However, the court went on to say in the immediately following sentence *(supra,* at 229): "Although it is argued that the duty to keep occupied residential premises secure also encompasses the risk that an unsecured building might become a safe haven for crime begun on the street, we cannot agree that the scope of a landowner's duty should be extended to embrace members of the public at large, with no connection to the premises, who might be victimized by street predators."

At another point, after referring to public policy considerations in placing "controllable limits" on liability in certain circumstances, the court's opinion went on to say (69 NY2d, *supra,* at 230): "[I]n this case both logic and public policy weigh heavily in favor of confining the scope of defendant landowner's duty to protect against criminal acts to tenants

and others who might reasonably be expected to be on the premises." Once again, however, this sentence, which by itself could be read as suggesting a broad limitation on liability to those who are tenants and others reasonably expected to be on the premises, was followed by this clearly related sentence *(supra,* at 230): "An important consideration in this context is the fact that the landowner has no control over either the acts of the primary wrongdoer or the conditions on the public byways that make such acts all too commonplace".

The precise holding in *Waters* (69 NY2d, *supra,* at 230-231) was set forth concisely in the last paragraph of the opinion, as it had been in the first paragraph quoted above, in the following words: "Because defendant landowner had no relationship at all to the as-yet-unidentified wrongdoer whose presence on the street posed a threat to plaintiff's safety * * * and because this injured plaintiff had no association with the premises independent of the crime itself, the landowner's duty to maintain the security of the building may not be deemed to extend to her."

It is of course possible that in another case the considerations of public policy that led to the limitation of liability set forth in *Waters (supra)* may lead the Court of Appeals to further limit the liability of landlords who have failed in their duty of taking reasonable precautions against criminal activities on their premises to tenants and others who are reasonably expected to be on the premises. *Waters* did not set forth any such limitation and provides no basis for anticipating what would be a significant modification of the single principle of liability set forth in *Basso v Miller (supra).* Under the facts set forth in this case, accepting everything set forth in defendants' factual presentation, it is clear that *Waters* does not exclude an action for damages sustained from a crime that was commenced on defendants' premises, completed on defendants' premises, and linked throughout with defendants' premises.

Accordingly, the order of the Supreme Court, New York County (William P. McCooe, J.), entered on or about June 30, 1987, which denied defendants' motion pursuant to CPLR 3212 for summary judgment dismissing the complaint, should be affirmed.