JANE DOE *v.* SEYMOUR MANHEIMER ET AL.
(13628)

PETERS, C. J., SHEA, GLASS, COVELLO and HULL, Js.

Argued June 14—decision released August 22, 1989

*Wesley W. Horton,* with whom were *Kimberly A. Knox* and *Chester W. Fairlie,* for the appellant (plaintiff).

*Joseph A. Hourihan,* with whom, on the brief, were *Leslie S. Sheppard* and *Joan Keating-McKeon* and *Thomas Noguerola,* legal interns, for the appellee (named defendant).

GLASS, J. The difficult issue in this case is whether a landowner may be liable in tort for damages arising from the rape of a pedestrian committed on the landowner's property behind brush and trees that shielded the area from view from the nearby public sidewalk and street.

I

The plaintiff, Jane Doe, worked as a meter reader for the Connecticut Light and Power Company in New London. On July 30, 1984, her employers assigned her to work in the Green Street area. At approximately 8 a.m., as she walked along Green Street, she observed a man on the opposite sidewalk who appeared to be looking for directions. She crossed the street to offer assistance. As she came near, the man, a stranger, reached into a satchel, removed a gun, and held it against her. He forced her from the sidewalk through a paved vacant lot that abutted the street. The man then forced her onto adjacent property owned by the named defendant (hereinafter defendant) some fifty to seventy feet from the sidewalk. The defendant's property extended approximately six and three-quarter feet from the side of his building to the lot boundary parallel to the building. The area into which the plaintiff was forced was bounded by the defendant's building on one side and a retaining wall in the rear. On the other side, overgrown sumac bushes and tall grass shielded the area from view from the sidewalk and street.

Behind the sumac bushes, the abductor viciously assaulted and raped the plaintiff for thirty minutes. In the commission of the assault, the abductor used various items, including a rope and rubber gloves, which he had carried with him in his satchel. His possession of these items suggested that the sexual assault had been planned. The assailant fled after committing the crime and has never been identified or caught. The effect of the sexual assault upon the plaintiff has been severe. She has attempted suicide on several occasions. Her emotional and psychiatric problems have required and continue to require hospital confinement.

The plaintiff brought an action against the defendant for personal injuries sustained in the assault. The complaint alleged causes of action based on common law negligence, statutory negligence and public nuisance. In essence, she claimed that the defendant had failed to remove the overgrown vegetation although he knew or should have known that, because the neighborhood was a high crime area, third persons might use the overgrowth to conceal the perpetration of crimes against pedestrians. She asserted that, had the overgrowth not been present, the area in which the assault occurred would have been visible to passing motorists and pedestrians. Consequently, she alleged, the overgrowth caused and contributed to the assault and the duration of the assault.

The action was tried to a jury before the court, *Walsh, J.* Several witnesses described the neighborhood where the sexual assault had been committed as a high crime area. Another rape had occurred in a neighborhood building about three months prior to the sexual assault against the plaintiff. Approximately fourteen months prior to the assault, Clara Manheimer, the defendant's ninety year old mother, had been bound, gagged and robbed in the package store at the front

of the building on the defendant's property. Prostitution and drug dealing were more prevalent in that section of New London than in other sections. Further, derelicts and homeless people frequented the site where the assault occurred and the adjacent vacant lot through which the plaintiff had been forced from the sidewalk. Various debris littered the area, including liquor and wine bottles and cans. Street people had scattered cardboard boxes, mattresses and blankets that they used when they slept there at night. There was also evidence that on occasion, some of those people had been compensated with free liquor for cleaning the vacant lot. The police frequently had removed from the area people too drunk to care for themselves.

In addition to testimony concerning the assault and the condition of the site, the plaintiff presented George Rand, an environmental psychologist. Rand testified that he personally examined the location of the assault, the surrounding neighborhood, and, for lack of a better term, the cultural activities and history of the area. He testified that, in his opinion, the physical configuration of the specific site increased the risk of violent crimes between strangers by creating a "protective" zone that reduced or eliminated visibility and, hence, served as an inducement for crime. He summarized the results of his study by testifying that "I've analyzed the local site, the sub area, the presence of adult entertainment, activities, sexually oriented businesses. I've looked at prior crimes. . . . The fact that it is an area of the city with a relatively high incidence of crime. And I . . . assumed as a result of those observations that there was a persistent and inappropriate use of that site based on the evidence that it was periodically and frequently used by drunks . . . . There was fighting. Police came. A history of complaints. All those things

indicate a condition of environmental disorder that I would contend is potentially related to increasing the risk of crime."

Melvin Jetmore, a building official for the city of New London and one of the authors of the housing code, testified for the plaintiff that the site of the defendant's property where the rape had occurred violated the housing code due to the presence of an "obnoxious" overgrowth of sumac trees and brush, and various debris including papers, shingles and broken glass. Jetmore testified that prior to the assault, New London had notified the defendant in March, 1983, and again in February, 1984, of the housing code violations, and that Jetmore had specifically told the defendant to remove all the debris and broken glass and "cut all the bushes and trees down." The defendant, however, did not correct the violations.

The plaintiff also presented conflicting testimony concerning the "purpose" of the pertinent housing code provisions.[1] Jetmore testified that the relevant provi-

[1] Section 411 of the New London housing code in effect at the time of the incident provided in pertinent part: "All exterior property areas shall be maintained in a clean and sanitary condition free from any accumulation of rubbish or garbage. The exterior property areas . . . shall be kept free of all nuisances, and any hazards to the safety of occupants, pedestrians and other persons . . . and any of the foregoing shall be promptly removed and abated by the owner or operator. It shall be the duty of the owner . . . to keep the premises free of hazards which include but are not limited to the following:

"411.1 REFUSE Brush, weeds, broken glass, stumps, roots, obnoxious growth, filth, garbage, trash, refuse, debris, and junk motor vehicles.

"411.2 NATURAL GROWTH Dead and dying trees and limbs or other natural growth which by reason of rotting or deteriorating condition or storm damage, constitute a hazard to persons in the vicinity thereof. Trees shall be kept pruned and trimmed to prevent such condition.

"411.3 LANDSCAPING Premises shall be kept landscaped and lawns, hedges and bushes shall be kept trimmed and from becoming overgrown and unsightly where exposed to public view and where the same constitutes a blighting factor depreciating adjoining property and impairing the good residential character of the neighborhood."

sions of the city housing code were designed to prevent deterioration and "blight" and to keep property clear of "nuisances and hazards to the safety of occupants, pedestrians and so forth." Further, Robert Finn, a housing code officer for the town of Plainville, testified initially that in his opinion, it was a function of the housing code to eliminate such hazards as "possible places for concealment of criminal activity." On recross-examination, however, Finn contradicted himself, and testified that it was not a purpose of the housing code to prevent the concealment of persons who intend to commit criminal activity. He concluded, "I can't say that those trees should be removed because of an anticipated crime. But, they should be removed because they violate the code."

At the close of the plaintiff's case, the defendant rested without presenting evidence and moved for a directed verdict. The trial court reserved a decision on the defendant's motion. Thereafter, the jury returned a general verdict in favor of the plaintiff, and awarded her $540,000 in damages. The parties did not seek separate verdicts on either count, or request the submission of interrogatories to the jury. Subsequently, however, the trial court set aside the verdict on the defendant's motion. In setting aside the verdict, the trial court first observed that "[w]ithout the shielding [of the overgrowth], the rape most probably would not have occurred [on the defendant's property]." The court implicitly found that the defendant owed the plaintiff a duty of reasonable care, stating that, "[i]n the neighborhood described in the present case, a trier of fact may . . . find the occurrence of violence reasonably foreseeable in such a sheltered location to be perpetrated by someone lying in ambush or by someone also using the public right of way who harbors an intent to drag into concealment and out of public view some other party also using the public right of way to inflict

harm." It also found that the "breach of duty whether common law or statutory or the creating or permitting of a public nuisance was the position of the sumac bush."

Despite finding a legally cognizable duty and a breach of that duty, the trial court nevertheless ruled that "the shielded bushing did not cause the injury. The rape and assault caused the injury and damages." "That shielding [which was described as the building, a retaining wall and sumac trees and/or bushes] could have been provided in that same place and time by some other validly positioned or placed apurtenance." The court concluded, therefore, that as a matter of law, the jury could not find that the defendant's maintenance of overgrowth on his property was a "substantial factor" in producing the plaintiff's injuries and, hence, the plaintiff had failed to establish proximate cause.

## II

The plaintiff appealed to the Appellate Court from the judgment of the trial court granting the defendant's motion to set aside the verdict. We transferred the case to ourselves pursuant to Practice Book § 4023. On appeal, the plaintiff claims that the trial court erred in setting aside the verdict on the ground that the plaintiff had not established proximate cause as a matter of law.[2] She asserts that evidence pertaining to the condition of the defendant's property, in connection with evidence that the neighborhood was a high crime area and that the specific site was frequented by trespassing street people and derelicts, created a question of fact for the jury whether the harm the plaintiff had

[2] The defendant in the alternative argues that the trial court's decision to set aside the verdict can be supported on the ground that the defendant owed the plaintiff no "duty" to exercise reasonable care. Because we dispose of this case in the defendant's favor on the issue presented by the plaintiff, we do not address the issue of "duty."

suffered was reasonably foreseeable to the defendant. She avers, therefore, that the trial court erred in concluding that the criminal act of the unknown assailant was the supervening cause of the plaintiff's injuries as a matter of law. Further, she argues that the trial court's conclusion that the condition of the defendant's property was not a "substantial factor" in causing the plaintiff's injuries was inconsistent with its prior finding that "the occurrence of violence [was] reasonably foreseeable in such a sheltered location" and that "[w]ithout the shielding, the rape most probably would not have occurred there." Consequently, she claims, the court erred in setting aside the jury's verdict in her favor on the ground that she had failed to prove proximate cause. We are not persuaded.

## A

"Proximate cause" is an element of proof of all three causes of action asserted by the plaintiff. See, e.g., *Catz* v. *Rubenstein,* 201 Conn. 39, 44, 513 A.2d 98 (1986) (elements of negligence are duty, breach, causation and damages); *Madenford* v. *Interstate Lumber & Mill Corporation,* 153 Conn. 62, 64, 212 A.2d 588 (1965) (to be actionable, violation of statute must proximately cause injury);[3] *State* v. *Tippetts-Abbett-McCarthy-Stratton,* 204 Conn. 177, 183, 527 A.2d 688 (1987) (actionable nuisance must proximately cause injuries).[4] The plain-

---

[3] "In order to establish liability as a result of a statutory violation, a plaintiff must satisfy two conditions. 'First, the plaintiff must be within the class of persons protected by statute. [*Coughlin* v. *Peters,* 153 Conn. 99, 101, 214 A.2d 127 (1965)]; *Hassett* v. *Palmer,* 126 Conn. 468, 473, 12 A.2d 646 [1940]; *Monroe* v. *Hartford Street Ry. Co.,* 76 Conn. 201, 207, 56 A. 498 [1903]. Second, the injury must be of the type which the statute was intended to prevent. *Toomey* v. *Danaher,* 161 Conn. 204, 212, 286 A.2d 293 [1971]; *Longstean* v. *McCaffrey's Sons,* 95 Conn. 486, 493, 111 A. 788 [1920]. See Prosser, Torts (4th Ed.) § 36; Restatement (Second), 2 Torts §§ 286, 288.' *Wright* v. *Brown,* 167 Conn. 464, 468–69, 356 A.2d 176 (1975)." *Berchtold* v. *Maggi,* 191 Conn. 266, 274–75, 464 A.2d 1 (1983).

[4] "Our prior decisions have established that in order to prevail on a claim of nuisance, a plaintiff must prove that: '(1) the condition complained of

tiff has not argued that a different proximate cause analysis may or should apply to the different causes of action alleged. Therefore, although the jury's general verdict requires us to "presume that the jury found every issue in favor of the prevailing party"; *Finley* v. *Aetna Life & Casualty Co.,* 202 Conn. 190, 202, 520 A.2d 208 (1987); *Stone* v. *Bastarache,* 188 Conn. 201, 204, 449 A.2d 142 (1982); *Collucci* v. *Pinette,* 185 Conn. 483, 489, 441 A.2d 574 (1981); our analysis of the proximate cause issue embraces the plaintiff's separate claims of common law negligence, statutory negligence and public nuisance.

Ordinarily, "the decision to set aside a verdict involves the exercise of a broad legal discretion by the trial court which, in the absence of a clear abuse, will not be disturbed; *Lee* v. *Lee,* [171 Conn. 1, 3, 368 A.2d 11 (1976)]; and further, that in reviewing the exercise of that discretion every reasonable presumption should be indulged in favor of its correctness. *Angelica* v. *Fernandes,* 174 Conn. 534, 535, 391 A.2d 167 (1978); *Ardoline* v. *Keegan,* 140 Conn. 552, 555, 102 A.2d 352 (1954)." *Jacobs* v. *Goodspeed,* 180 Conn. 415, 416, 429 A.2d 915 (1980). The trial court's discretion, however, is circumscribed by our recognition that the "issue of proximate cause is ordinarily a question of fact for the trier. *Tetro* v. *Stratford,* 189 Conn. 601, 605, 485 A.2d

had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; [and] (4) the existence of the nuisance was a proximate cause of the plaintiffs' injuries and damages.' *Filisko* v. *Bridgeport Hydraulic Co.,* 176 Conn. 33, 35–36, 404 A.2d 889 (1978); *Kostyal* v. *Cass,* 163 Conn. 92, 99–100, 302 A.2d 121 (1972); *Heilig* v. *LeQuire,* 4 Conn. App. 125, 127, 492 A.2d 542 (1985). . . . [W]here . . . public nuisance is alleged, the plaintiff's burden [also] includes . . . (1) that the condition or conduct complained of interfered with a right common to the general public; *Higgins* v. *Connecticut Light & Power Co.,* 129 Conn. 606, 611, 30 A.2d 388 (1943); *Nolan* v. *New Britain,* 69 Conn. 668, 678, 38 A. 703 (1897); 4 Restatement (Second), Torts § 821B . . . ." *State* v. *Tippetts-Abbett-McCarthy-Stratton,* 204 Conn. 177, 183, 527 A.2d 688 (1987).

5 (1983). 'Conclusions of proximate cause are to be drawn by the jury and not by the court.' *Fox* v. *Mason,* 189 Conn. 484, 489, 546 A.2d 1196 (1983). ' "It becomes a conclusion of law only when the mind of a fair and reasonable man could reach only one conclusion; if there is room for a reasonable disagreement the question is one to be determined by the trier of fact." . . . ' " *Trzcinski* v. *Richey,* 190 Conn. 285, 295, 460 A.2d 1269 (1983). Thus, the trial court's judgment setting aside the jury's verdict may stand only if there was no "room for a reasonable disagreement" on the question of proximate cause.

## B

To prevail on a negligence claim, a plaintiff must establish that the defendant's conduct "legally caused" the injuries. *Wu* v. *Fairfield,* 204 Conn. 435, 438, 528 A.2d 364 (1987); *Hearl* v. *Waterbury YMCA,* 187 Conn. 1, 4, 444 A.2d 211 (1982); W. Prosser & W. Keeton, Torts (5th Ed.) § 41, p. 263. As we observed in *Kowal* v. *Hofher,* 181 Conn. 355, 359, 436 A.2d 1 (1980), "[l]egal cause is a hybrid construct, the result of balancing philosophic, pragmatic and moral approaches to causation." The first component of "legal cause" is "causation in fact." " 'Causation in fact' is the purest legal application of . . . legal cause. The test for cause in fact is, simply, would the injury have occurred were it not for the actor's conduct." Id.

The second component of "legal cause" is proximate cause, which we have defined as " '[a]n actual cause that is a substantial factor in the resulting harm . . . .' *Coburn* v. *Lenox Homes, Inc.,* 186 Conn. 370, 383, 441 A.2d 620 (1982)." *Boehm* v. *Kish,* 201 Conn. 385, 391, 517 A.2d 624 (1986). The "proximate cause" requirement tempers the "expansive view of causation [in fact] . . . by the pragmatic . . . shaping [of] rules which are feasible to administer, and yield a workable degree

of certainty. 2 Harper & James, Torts § 20.4, p. 1133. Remote or trivial [actual] causes are generally rejected because the determination of the responsibility for another's injury is much too important to be distracted by explorations for obscure consequences or inconsequential causes." *Kowal* v. *Hofher, supra,* 359–60. "In determining proximate cause, the point beyond which the law declines to trace a series of events that exist along a chain signifying actual causation is a matter of fair judgment and a rough sense of justice. See generally *Palsgraf* v. *Long Island R.R. Co.,* 248 N.Y. 339, 352, 354–56, 162 N.E. 99 (1928) (Andrews, J., dissenting)." *Boehm* v. *Kish, supra,* 391–92.

This court has often stated that the "test" of proximate cause is whether the defendant's conduct is a "substantial factor" in producing the plaintiff's injury. *Wu* v. *Fairfield, supra,* 438; *Boehm* v. *Kish, supra; Tetro* v. *Stratford, supra;* see also *Ferndale Dairy, Inc.* v. *Geiger,* 167 Conn. 533, 538, 356 A.2d 91 (1975) (defining "substantial factor" as one which "must have continued down to the moment of the damage or, at least, down to the setting in motion of the final active injurious force which immediately produced or preceded the damage"); but see W. Prosser & W. Keeton, supra, p. 278. That negligent conduct is a "cause in fact," however, obviously does not mean that it is also a "substantial factor" for the purposes of a proximate cause inquiry. The "substantial factor" test, in truth, reflects the inquiry fundamental to all proximate cause questions; that is, " 'whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence.' *Merhi* v. *Becker,* [164 Conn. 516, 521, 325 A.2d 270 (1973)]; see *Palsgraf* v. *Long Island R.[R.] Co.,* [supra, 354]." *Coburn* v. *Lenox Homes Inc., supra,* 384. In applying this test, we look " 'from the injury to the negligent act complained of for the necessary causal connection. *Collins* v. *City*

*National Bank & Trust Co.,* 131 Conn. 167, 171, 38 A.2d 582 [1944].' " *Peterson* v. *Oxford,* 189 Conn. 740, 749, 459 A.2d 100 (1983).

The "scope of the risk" analysis of "proximate cause" similarly applies where, as here, the risk of harm created by the defendant's negligence allegedly extends to an intervening criminal act by a third party. See *Tetro* v. *Stratford,* supra, 605; *Coburn* v. *Lenox Homes, Inc.,* supra. "We have consistently adhered to the standard of 2 Restatement (Second), Torts § 442B (1965) that a negligent defendant, whose conduct creates or increases the risk of a particular harm and is a substantial factor in causing that harm, is not relieved from liability by the intervention of another person, *except* where the harm is intentionally caused by the third person *and* is not within the scope of the risk created by the defendant's conduct. *Kiniry* v. *Danbury Hospital,* 183 Conn. 448, 455, 439 A.2d 408 (1981); *Merhi* v. *Becker,* [supra, 522]; *Miranti* v. *Brookside Shopping Center, Inc.,* 159 Conn. 24, 28, 266 A.2d 370 (1969)." (Emphasis added.) *Tetro* v. *Stratford,* supra. "The reason [for the general rule precluding liability where the intervening act is intentional or criminal] is that in such a case the third person has deliberately assumed control of the situation, and all responsibility for the consequences of his act is shifted to him." 2 Restatement (Second), Torts § 442B, comment c. "Such tortious or criminal acts may in themselves be foreseeable, [however,] and so within the scope of the created risk . . . ." Id.; see also 2 Restatement (Second), Torts §§ 448 and 449.[5]

---

[5] The Restatement (Second) of Torts, § 448 provides: "The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the

## C

Applying these principles, we first note that the defendant has not argued that his conduct was not a "cause in fact" of the plaintiff's injuries. The trial court found that the sexual assault most probably would not have occurred *where it actually occurred* had the overgrown vegetation not been present. The court also found that the jury could have found from the evidence that the rapist "by design and plan premeditated that the sexual assault would occur in that exact location." Further, there was evidence from which the jury could reasonably have found that the assault would not have lasted thirty minutes absent the shielding provided by the overgrowth. "The conception of causation in fact extends not only to positive acts and active physical forces, but also to pre-existing passive conditions which have played a . . . part in bringing about the event." W. Prosser & W. Keeton, supra, p. 265. Under the circumstances, we have no reason to question the trial court's finding that the injury would not have occurred, where it actually occurred, were it not for the shielding created by the overgrowth. *Boehm* v. *Kish,* supra; *Kowal* v. *Hofher,* supra.

We disagree with the plaintiff, however, that there was room for reasonable disagreement over the question whether the condition on the defendant's property proximately caused her injuries. *Trzcinski* v. *Richey,* supra. The plaintiff argues that there was sufficient evidence for the jury to find that the impaired visibility created by the overgrowth, in conjunction with the manner in which the defendant's property was used

---

opportunity to commit such a tort or crime." Section 449 provides: "If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby."

and the unseemly character of the neighborhood, increased the risk of violent crime between strangers. She claims, therefore, that under § 442B of the Restatement, the assailant's act was within the "scope of the risk" created by the condition of the defendant's property. We are persuaded, however, that the plaintiff's application of § 442B of the Restatement is unduly broad. Contrary to her assertion, the harm she suffered cannot reasonably be understood as within the scope of the risk created by the defendant's conduct. We reach this conclusion on the basis of the applicable standards established in our cases as well as by reference to factually analogous precedents.

First, we decline to accept the plaintiff's argument suggesting that it was within the "scope of the risk" that the condition of the defendant's land might catalyze a criminal assault. The plaintiff presented expert testimony that conditions of "environmental disorder," such as those present on the defendant's property and within the surrounding neighborhood, stood in a direct and positive relationship with an increased risk of violent crimes between strangers. She also presented evidence tending to indicate that the assailant had planned the crime around the site. Thus, the plaintiff's theory of liability turns in part on the argument that because the overgrowth was instrumental, in a psychological and sociological sense, in fostering the criminal act, the defendant should be held liable.

This argument envisages the rapist's conduct as a "dependent intervening force"; that is, a predictable response or "reaction to the stimulus of a situation for which the actor has made himself responsible by his negligent conduct." 2 Restatement (Second), Torts § 441, comment c. This position is untenable. First, it is clear that § 442B contemplates *reasonably foreseeable* intervening misconduct, rather than *all* conduct that actually proceeds from a situation created by the

defendant. *Coburn* v. *Lenox Homes, Inc.,* supra, 375, 384. We are not persuaded that a landowner should reasonably foresee that a condition on his property such as overgrown vegetation might provide a substantial incentive or inducement for the commission of a violent criminal assault between strangers. This is true although once such an incident does occur, it necessarily "could" have occurred. Violent crimes are actuated by a host of social and psychological factors. Although, as a matter of fact, it may be true that one of those actuating factors is mere opportunity for concealment, common experience informs us that such a factor is at most incidental. A prudent person who owns land abutting a public way would not, in our opinion, infer from his ordinary experience the possibility that overgrown vegetation will prompt or catalyze a violent criminal act. This theory ascribes far too much speculative imagination to a "reasonable" or "prudent" person. A person of ordinary caution is not required to be accomplished at making such recondite associations.

Moreover, in the present case, there was no evidence tending to demonstrate that the defendant had had any past experience that might reasonably have led him to perceive and act on the atypical association between "natural shields" such as overgrown vegetation and violent criminal activity. Indeed, the evidence showed that the prior "criminal activity" occurring in the vacant lot abutting his property and the scene of the crime generally was nonviolent, involving vagrancy and the public consumption of alcohol. The plaintiff has not directed our attention to evidence that any of the individuals who frequented the vacant lot threatened or assaulted any passersby or local residents, except to the extent that their mere presence and appearance was "threatening." Moreover, evidence that the defendant's mother had been robbed in the liquor store on the defendant's premises, and that a rape had

occurred in a nearby building more than two months prior to the assault on the plaintiff, does not require a different conclusion. Both incidents occurred indoors. The fact that criminals will rob liquor stores is an unfortunate, but not extraordinary, fact of contemporary life, and cannot reasonably be seen as exciting the imagination of a prudent person to suppose that a violent sexual crime will occur behind nearby overgrown vegetation in the area of a vacant lot. Further, even if it is assumed that the defendant knew or should have known of the rape in the nearby building, the plaintiff has not presented evidence demonstrating anything distinctive about that inherently atrocious incident that might be reasonably understood as eliciting the type of sensitivity for which she would now hold the defendant accountable. In addition, that experts in environmental psychology such as George Rand are attuned to the association between conditions of "environmental disorder," such as overgrown vegetation in a poor neighborhood, and crime is surely a product of special training, knowledge, interest and, especially, perspective.

Further, the theory of "catalyst" liability suggested by the plaintiff is far too ambitious. We are persuaded that such a principle would eliminate the role of "proximate cause" in "shaping rules which are feasible to administer, and yield a workable degree of certainty." *Kowal* v. *Hofher,* supra, 359–60. Indeed, under this principle, for example, parents of a violent adult child might well be held liable to third persons injured by that child's crime if the victim only establishes a positive relationship between the parents' poor parenting skills and the child's violence. We have little doubt that, in any particular case, such a victim could establish a "cause in fact" in such a case. This hypothetical illustrates the fundamental weakness of the plaintiff's position: it renders "proximate cause" coextensive with

"cause in fact." "Proximate cause," however, deals with liability, not physics. W. Prosser & W. Keeton, supra, p. 302.

No different result ensues from the plaintiff's less dramatic argument that the condition on the defendant's property, in connection with the "socio-chemistry" of the area, created a foreseeable "opportunity" for the commission of a violent crime and, hence, the harm inflicted on the plaintiff was within the "scope of the risk." Our cases make it clear that, to be within the "scope of the risk," the harm actually suffered must be of the same "general type" as that which makes the defendant's conduct negligent in the first instance. *Coburn* v. *Lenox Homes, Inc.*, supra. It is unexceptional to impose upon a landowner liability resulting from injuries caused directly and without intervening criminal conduct by "dangerous conditions" on the land. Thus, where the plaintiff stumbles on accumulated debris on the defendant's land, and injures himself, the defendant may be liable. *Miranti* v. *Brookside Shopping Center, Inc.*, supra. We are not prepared, however, to extend the scope of the foreseeable risk presented by "obnoxious overgrowth" or accumulated debris beyond injury produced by physical contact with such conditions. Thus, the harm suffered by the plaintiff in this case was not of the same general type that allegedly made the defendant negligent.

Even if liability could extend beyond injury caused by physical contact with "dangerous conditions" on a defendant's property, the relationship between the "opportunity" of shielding and the plaintiff's harm in this case was accidental. As the trial court found, there could have been any number of natural or nonnatural conditions on the defendant's property that would have shielded the assault. We do not understand the plaintiff to contend that every conceivable item that could have shielded the occurrence of a violent crime should

be deemed a basis for negligence because of the potential for crime endemic in an urban neighborhood. Indeed, although there was evidence that the "overgrowth" violated the New London housing code because it created the appearance of "blight," the plaintiff does not bring to our attention any testimony, or any provision of the housing code, that demonstrates that the code would prohibit the maintenance of neatly trimmed vegetation, such as a hedge, that also could serve to screen the commission of a violent crime. Further, we would be offending common sense if we failed to recognize that the objects in the world behind which a criminal act may be concealed are manifold. The plaintiff, therefore, has not established a necessary relationship between the defendant's negligence—that is, the maintenance of overgrown vegetation—and the "causative force" or shielding. Thus, she has failed to remove the issue of causation from the realm of speculation and conjecture. Cf. *Pisel* v. *Stamford Hospital,* 180 Conn. 314, 341–42, 430 A.2d 1 (1980).

Our conclusion is supported by many cases in which we have declined to hold that the defendant's conduct in contributing to the harm, principally caused "in fact" by another person or force, was a "proximate cause" of the harm. In *Nolan* v. *Morelli,* 154 Conn. 432, 436, 226 A.2d 383 (1967), we recognized the common law rule that "no tort cause of action lay against one who furnished, whether by sale or gift, intoxicating liquor to a person who thereby voluntarily became intoxicated and in consequence of his intoxication injured the person or property either of himself or of another." We held that "[t]he reason generally given for the rule was that the proximate cause of the intoxication was not the furnishing of the liquor, but the consumption of it by the purchaser or the donee. The rule was based on the obvious fact that one could not become intoxicated by reason of liquor furnished him if he did not drink

it." Id., 436–37; see also *Boehm* v. *Kish,* supra, 389; *Kowal* v. *Hofher,* supra, 357–58; *Slicer* v. *Quigley,* 180 Conn. 252, 255, 429 A.2d 855 (1980) (all reaffirming *Nolan*). Similarly, in *Vastola* v. *Connecticut Protective System, Inc.,* 133 Conn. 18, 21, 47 A.2d 844 (1946), we reversed the trial court's judgment for the plaintiff on the ground that the plaintiff did not prove that the nonactivation of a burglar alarm installed in the plaintiff's premises was a proximate cause of a burglary. In reasoning directly applicable to the present case, we observed that whether the ringing of the alarm would have prevented the loss was "pure speculation." " 'Whether that would have been the result had the apparatus been in working order can never be known. It would depend upon contingencies without number, any one of which would have been sufficient to disappoint it.' " Id., 22; see also *Robinson* v. *Southern New England Telephone Co.,* 140 Conn. 414, 418, 420, 101 A.2d 491 (1953) (under common law principles, a telephone company operator's negligence in placing emergency fire call to remote rather than nearby fire department not proximate cause of extent of fire damage).

Our subsequent adoption of § 442B of the Restatement in *Miranti* v. *Brookside Shopping Center, Inc.,* supra, does not undermine the value of these prior precedents. In *Cardona* v. *Valentin,* 160 Conn. 18, 20–21, 273 A.2d 697 (1970), decided after *Miranti,* the defendant was the owner of a pool hall. The pool hall manager, Morales, got into a fist fight with the plaintiff's decedent, Cardona, a customer who refused to pay. The owner interceded and broke up the fight. As the owner escorted Cardona out of the pool hall, however, Cardona's brother Angel and his friends entered the pool room and began to throw various objects. In the ensuing fight, Morales stabbed and killed Cardona. The decedent's father brought an action against the

pool hall owner, alleging, inter alia, negligence in his failure to hire adequate security. Id., 23. The trial court found, however, that even if the defendant had been negligent, his negligence was not the proximate cause of Cardona's death. On appeal, we applied § 442B of the Restatement, and held that "the court could reasonably conclude that the actions of Angel Cardona and his friends were the proximate cause of the death rather than any alleged negligence on the part of the defendant . . . ." Id., 25. Thus, in *Cardona,* we assumed that the defendant had been negligent in creating a condition that constituted a "cause in fact" of Cardona's death, and yet we nevertheless upheld the trial court's determination that the intervening intentional misconduct of Angel Cardona, who instigated the second brawl, superseded the defendant's negligence. *Cardona* reflects, therefore, that our "fair judgment and . . . sense of justice"; *Boehm* v. *Kish,* supra; in applying § 442B requires a fairly strong degree of certainty that a criminal or intentional intervening act is within the "scope of the risk" of a negligent actor's conduct. See also 2 Restatement (Second), Torts § 442B, comment c, illus. 7.

*Miranti* v. *Brookside Shopping Center, Inc.,* supra, on which the plaintiff places much reliance, is factually dissimilar to the present case. In *Miranti,* the plaintiff, a fifteen year old boy, was chased and knocked down by a dog, and fell over an accumulation of trash and debris on property alleged to be under the control of the defendants. The trial court, concluding that the proximate cause of the fall and resulting injury was solely the action of the dog in knocking the plaintiff down rather than the accumulation of trash and debris, rendered judgment for the defendants on their motion for summary judgment. We reversed, holding that the pleadings raised contested issues as to whether an accumulation of trash and debris did, in fact, exist, and,

if it did, as to whether it created a condition productive of a foreseeable harm of the general nature of that suffered by the plaintiff, and as to which the defendants could be held legally responsible for the condition in any one or more of the ways claimed by the plaintiff. Unlike *Miranti*, where the plaintiff was injured when he fell over the trash and debris on the defendants' property, in this case the plaintiff was injured by the criminal act of her abductor. The sumac trees, the bushes, debris or litter on the defendant's property did not injure the plaintiff. Nor, unlike *Miranti*, does the "scope of the risk" presented by the "dangerous" condition on the defendant's property extend to the harm of the general nature suffered by the plaintiff.

We note here that the courts of other jurisdictions have not exhibited any unanimity in dealing with the question of liability under these circumstances. Compare *Parker* v. *D/U Realty Co.*, 141 App. Div. 2d 301, 530 N.Y.S.2d 137 (1988) (where decedent taken from street to defendant's parking lot and murdered, no liability where no connection between decedent and premises independent of crime itself), *Waters* v. *New York City Housing Authority*, 116 App. Div. 2d 384, 501 N.Y.S.2d 385 (1986), aff'd, 69 N.Y.2d 225, 505 N.E.2d 922, 513 N.Y.S.2d 356 (1987) (no liability where passerby forced from street to nearby building of defendant), and *Goldberg* v. *Housing Authority*, 38 N.J. 578, 186 A.2d 291 (1962) (holding no duty of housing authority to police housing project and, therefore, no liability for plaintiff's injuries sustained in robbery), with *Copithorne* v. *Framingham Union Hospital*, 401 Mass. 860, 520 N.E.2d 139 (1988) (whether hospital's negligence proximate cause question of fact where it had actual notice of visiting staff physician's past sexual misconduct and physician drugged and raped employee in employee's apartment), and *Daniel* v. *Days Inn of America, Inc.*, 292 S.C. App. 291, 356 S.E.2d 129 (1987)

(holding that hotel's failure to provide security was proximate cause of rape of invitee of hotel guests). We have examined the cases from other jurisdictions upon which the plaintiff relies, however, and find them to be factually distinguishable. See, e.g., *Phillips* v. *Chicago Housing Authority,* 91 Ill. App. 3d 544, 414 N.E.2d 1133 (1980), aff'd, 89 Ill. 2d 122, 431 N.E.2d 1038 (1982) (question of fact whether defendant liable where it negligently sealed vacant floor in area in which rapes were frequent, and tenant subsequently raped and murdered); *Loeser* v. *Nathan Hale Gardens, Inc.,* 73 App. Div. 2d 187, 425 N.Y.S.2d 104 (1980) (where tenant was raped in landlord's unlighted parking lot, proximate cause established since evidence documenting relationship between crime and absence of light "emphatically confirmed by common experience"); *Nixon* v. *Mr. Property Management Co.,* 690 S.W.2d 546 (Tex. 1985) (rape of plaintiff in defendant's vacant apartment building). Thus, this is not a case in which it is apparent that a significant number of other jurisdictions would support the plaintiff's arguments. Cf. *Tetro* v. *Stratford,* supra, 606–607 (where vehicle pursued by police collides with plaintiff, court follows "emergent majority view" of other jurisdictions that intervening negligent or reckless driving of automobile pursued by police will not relieve town of liability as a matter of law).

Finally, we disagree with the plaintiff's assertion that the trial court's conclusion that the occurrence of violence in such a sheltered location was reasonably foreseeable, and that the rape would not have occurred where it did absent the overgrowth, undermined its conclusion that the condition of the defendant's property was not a "substantial factor" of the plaintiff's harm. A review of the trial court's memorandum indicates that the court's prior remarks addressed the issues of duty and factual cause rather than proximate

cause. We conclude, therefore, that there was no "room for a reasonable disagreement" that the plaintiff did not establish that the condition on the defendant's land was a proximate cause of the sexual assault. *Trzcinski* v. *Richey*, supra. Accordingly, the trial court did not err in setting aside the jury's verdict in favor of the plaintiff. See *Magarian* v. *Bessoni*, 160 Conn. 442, 280 A.2d 357 (1971); *Robinson* v. *Southern New England Telephone Co.*, supra.

There is no error.

In this opinion the other justices concurred.