Jack GARAMELLA, Conservator FOR
the ESTATE OF Denny
ALMONTE

v.

NEW YORK MEDICAL
COLLEGE, et al.

No. Civ. 3:93CV116 (HBF).

United States District Court,
D. Connecticut.

Sept. 11, 1998.

Karen E. Koskoff, Susan Fink, Koskoff, Koskoff & Bieder, Bridgeport, CT, for plaintiff.

Bruce Young, Kanterman & Taub, P.C., New York City, NY, for defendants.

## RULING ON NEW YORK MEDICAL COLLEGE'S MOTION FOR SUMMARY JUDGMENT

FITZSIMMONS, United States Magistrate Judge.

This is an action for personal injury, filed by a patient sexually abused by a psychiatric resident at Danbury Hospital. The defendants in this case are New York Medical College ("NYMC"), the institution which supervised the residency, and Dr. Douglas Ingram, a faculty member at NYMC, with whom the abuser underwent personal analysis as a requirement of his training in psychoanalysis. Plaintiff claims that the medical school and Dr. Ingram had a duty to warn or otherwise prevent the resident, R. Joseph DeMasi, from harming children in his care.[1]

Plaintiff alleges four causes of action against NYMC grounded in negligence and breach of contract.[2] NYMC moves for sum-

---

1. DeMasi was prosecuted criminally for assaulting the plaintiff, convicted by guilty plea, and incarcerated. The plaintiff, Denny Almonte, now 19 years old, is also incarcerated.

2. Count One states a claim against NYMC for negligence for permitting DeMasi to progress in the residency program "where they knew he would be in a position of treating young children, when they knew or should have known that he was not competent to do so." In Count Two, plaintiff alleges that NYMC "breached its contract with Danbury Hospital ... [for] not pro-

vid[ing] post-graduate medical students/residents who were competent to serve the needs of the medical community." Count Three alleges a cause of action for negligence against NYMC, as DeMasi, as a resident of NYMC, "breached the standard of care required of fourth year post-graduate students at medical colleges in the United States in 1986." Last, Count Four alleges negligence against NYMC for negligent failure to warn. Specifically, that NYMC, "its agents, servants and employees had a duty to warn Danbury Hospital ... and Denny Almonte's parents, of the pedophilia of Joseph DeMasi and of Joseph

mary judgment on six grounds, arguing that (1) NYMC had no duty· to warn plaintiff and/or to control DeMasi's behavior; (2) NYMC had no duty to unforeseeable victims; (3) NYMC had no duty to victims of superseding intervening criminal acts; (4) plaintiff is not the third-party beneficiary of a contract between NYMC and Danbury Hospital; (5) there was no agency relationship between NYMC and Dr. Ingram and/or NYMC and Joseph DeMasi; and (6) NYMC cannot be held liable under the theory of respondeat superior.

For the reasons that follow, NYMC's motion for summary judgment **[Doc. # 194]** is **GRANTED** in part and **DENIED** in part.[3]

As a preliminary matter, in the ruling on Dr. Ingram's Motion for Summary Judgment, this Court has addressed the arguments concerning (1) whether Ingram had a duty to warn/duty to control; (2) the question of foreseeability and whether Denny Almonte was a member of a class of identifiable victims; (3) the issue of confidentiality between Dr. Ingram and Joseph DeMasi; and (4) the dueling public policy considerations relating to confidentiality between a psychiatrist and patient and the state's policy to encourage reporting of suspected child abuse. [*See* Doc. # 282]. The Court has reviewed NYMC's arguments and affirms its earlier ruling on these issues. Accordingly, the Court will address the arguments presented by the motion that are unique to NYMC.

### UNDISPUTED FACTS

*NYMC's Psychiatric Residency Program at Danbury Hospital*

In its Residency Review Book, the Accreditation Council for Graduate Medical Edu-

cation ("ACGME")[4] sets guidelines for graduate medical education that establishes the requirements for each specialty, including psychiatry. [Def. Ex. C at 43]. One such requirement is to provide residents with experience with the full spectrum of the "patient population, both in diagnostic terms as well as in socioeconomic, cultural, educational ethnic levels...." [Def. Ex. C at 42]. Toward this end, the Department of Psychiatry at NYMC developed a "Training Consortium" involving numerous hospitals to provide clinical rotations to its residents.[5] [Pl. Ex. 65 at 2]. The purpose was "to bring together in a partnership the comprehensive resources and staff of these institutions to share their training opportunities under the umbrella of the Department of Psychiatry of New York Medical College." [Pl.Ex. 65 at 2].

The goal of the psychiatric residency program is "the training of psychiatrists with a sound basis in the essentials of psychiatric knowledge." [Pl.Ex. 65 at 20]. "To assure a uniformly high level of teaching, the program is divided into didactic and clinical portions." [Pl.Ex. 65 at 21]. "Teaching techniques follow three formats: lectures, seminars, and individual supervision." [Pl.Ex. 65 at 21].

Each resident is assigned two supervisors. One is his attending in charge who in addition to daily supervision in rounds, sets aside an hour a week to go over his work carefully. The second supervisor is an attending who is not directly connected with the ward. The supervisor and resident work in close collaboration....

During the PGY–3 and PGY–4 year, the resident is assigned two senior faculty members, usually psychoanalysts, to supervise his long term intensive psychotherapy

DeMasi's incompetence to treat children as a fourth year post-graduate student." [Second Amend. Compl.].

**3.** This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [Doc. # 233] on February 23, 1998, with appeal to the Court of Appeals.

Considered were defendant's Motion for Summary Judgment [Doc. # 194], Memorandum in Support, Statement of Material Facts, and Exhibits A–E [Doc. ## 194, 195], plaintiff's Memorandum in Opposition [Doc. # 230], Statement of Disputed Facts [Doc. # 231], plaintiff's Exhibits

1–130, plaintiff's Sealed Statement of Disputed Facts, [Doc. # 232] and defendant's Reply Brief [Doc. # 235].

**4.** ACGME is the body that reviews and accredits NYMC's residency training program in psychiatry. [Def. Ex. C at 44].

**5.** In 1984, the Department of Psychiatry and Behavioral Sciences at NYMC was affiliated with Westchester County Medical Center (parent institution), St. Vincent's Hospital, New York, St. Vincent's Hospital, Staten Island, Cabrini Hospital, Lenox Hill Hospital, Danbury Hospital, and Northern Westchester Hospital. [Pl.Ex. 65 at 2].

patients. He is to meet with his supervisor one hour per week. Supervision of his short term work is provided by the Chief of Service or his assistant. Every patient seen in the Admission Room is supervised. [Pl.Ex. 65 at 21–22]. During a resident's third year, he is assigned to a four month rotation in child and adolescent psychiatry.[6] [Pl.Ex. 65 at 37]. In the fourth year a resident has a four month elective rotation and may choose, among other electives, child and adolescent psychiatry. [Pl.Ex. 65]. According to NYMC's guidelines, one of the goals of the residency program was to "establish a residency training program of high quality by utilizing the resources which each hospital offers and by incorporating all programs into a centrally coordinated system of residency rotations." [Pl.Ex. 65 at 7].

To administrate the residency program, NYMC negotiated, approved and entered into affiliation agreements with certain institutions, including Danbury Hospital. [Pl.Ex. 65 at 2]. NYMC residents are monitored at the affiliate institutions in their care and treatment of patients. Residents are required to document data on the patients treated at the affiliated hospitals through the residency training program. DeMasi documented the patients seen by him at Danbury Hospital during his clinical rotation. The Resident's Log prepared by DeMasi was submitted to NYMC's Residency Program and included his treatment of Denny Almonte, who was listed by initials, age, sex and diagnosis for the months of September and October 1986. [Pl.Ex. 68].

*Affiliation Agreement Between NYMC and Danbury Hospital*

Danbury and NYMC had an affiliation agreement in place during 1985–86, with Proposed Guidelines, which were adopted as part of the Affiliation Agreement. [Pl.Ex. 3, 66].

At Danbury Hospital, "[r]esidency teaching responsibilities proceed[ed] under the direction of the Residency Training Director at New York Medical College.... Active liaison with Danbury Hospital based faculty with the New York Medical College is formal and ongoing via administrative, resident review meetings and didactic teaching responsibilities." [Pl.Ex. 65 at 16–17]. The Affiliation

Agreement required that Danbury Hospital appoint a coordinator of programs to act as a liaison with NYMC. [Pl.Ex. 66 at 2]. Dr. Arcuni was this coordinator at Danbury Hospital.

The Affiliation Agreement between Danbury and NYMC stated in relevant part that,

The Hospital is primarily committed to serving the medical care needs of its community. Beyond this basic purpose it *assumes responsibility*, wherever feasible, to use its resources for purposes of education and research.

On the other hand,

The Medical School is primarily committed to the education of physicians and other health care personnel. Beyond this basic purpose it *assumes responsibility*, wherever feasible, to use its resources to improve the delivery of health care through efforts in research, patient care and community service.

The Agreement further states that,

Although each party has a different order of priorities, there is agreement that medical education and medical care are interdependent and that, therefore, the Hospital and the Medical School *share a common set of goals*. Both parties agree that the best delivery of health services occurs in an environment of education and research. In recognition of this fact, it is agreed that a formal affiliation between the hospital and the Medical School will be mutually advantageous since it will draw upon the special capabilities of each party in support of a *commonality of purpose*.

[Pl.Ex. 66 at 1 (emphasis added) ].

The Guidelines appended to the Affiliation Agreement provides, at paragraph ten, that,

All patients admitted to the teaching service at an affiliated hospital will be available for the teaching program unless the patient's physician with the approval of the chief of service feels that participation in

---

**6.** DeMasi was promoted to his third year by Dr. Babikian on September 3, 1986. [Pl.Ex. 21].

the teaching program might adversely affect the patient's condition. [Pl.Ex. 3].

## Dr. Douglas Ingram

Dr. Ingram is a board certified psychiatrist with a sub-specialty in psychoanalysis. [Ingram Aff. ¶ 3]. Dr. Ingram was a voluntary (unpaid) attending physician and member of the faculty of NYMC, who accepted faculty assignments within the Department of Psychiatry and Behavioral Sciences, and the Division of Psychoanalytic Training. [Pl.Ex. 81 at 11]. Dr. Ingram was appointed Assistant Professor of Psychiatry of NYMC, effective May 1, 1985. [Pl.Ex. 17 at 110]. He was designated as a member of the Faculty of the Division of Psychoanalysis. [Doc. # 231 at 78]. Dr. Ingram's name was listed along with other faculty in the NYMC Psychoanalytic Training Brochure. [Pl.Ex. 79 at 3].

As a member of the faculty, Dr. Ingram taught didactic courses and provided training analysis to candidates. [Pl.Ex. 5 at 132]. Dr. Ingram provided psychoanalytic services to Dr. DeMasi at a reduced rate which NYMC set and DeMasi paid. [Pl.Ex. 81 at 12]. Even though there was no direct payment from NYMC for the training analysis, the agreement produced income as it provided a continuous source of patients.

Q: And within the psychoanalytic community, would that kind of appointment carry any other benefits other than prestige?

A: Yeah, it might ... On the positive side, if you're interested in doing analysis, which of course is different, if you're applying to be a trainer, you're making a career of this. Analytic patients are hard to find these days. It's expensive and time-consuming. You then have a steady flow of patients. If you like doing this work, that's an advantage.

[Pl.Ex. 17 at 139].

As a training analyst, Dr. Ingram was obligated to disclose to NYMC,

(A) whether the candidate was undergoing the personal psychoanalysis required by the Division of Psychoanalytic Training.

(B) whether the candidate was prepared to take on analysis of his own patients, and

[C] whether the candidate was prepared for certification as a psychoanalyst.

[Pl.Ex. 81 at 12].

Candidates of the Psychoanalytic Division were required to undergo training psychoanalysis conducted by a NYMC faculty member. [Pl.Ex. 17 at 62]. The Psychoanalytic Institute required that candidates attend analytic training sessions three times per week with the training analyst responsible for advising NYMC whether the student was attending. [Pl.Ex. 17 at 106, Ex. 81 at 12]. DeMasi was the first candidate from the Psychoanalytic Institute that Dr. Ingram saw for training analysis after his appointment to the NYMC faculty. [Pl.Ex. 17 at 111–12].

Dr. Ingram never reported to NYMC that DeMasi's psychoanalysis had ceased, he never advised NYMC that DeMasi was not prepared to analyze his own patients and he never indicated that DeMasi should not be certified.

## R. Joseph DeMasi

R. Joseph ("Rick") DeMasi, a psychiatry resident at New York Medical College, elected to pursue the study of psychoanalysis. [Doc. # 223 at 2]. On August 21, 1984, DeMasi was advised that he was accepted as a matriculated student in the Division of Psychoanalytic Training commencing September 1984. Further, DeMasi was advised to begin "personal analysis with a member of the faculty of the Division of Psychoanalytic Training '*no later than October 1, 1984.*'" [Pl.Ex. 15 (emphasis in original) ].

Training in psychoanalysis was not mandatory in order for a resident to become a psychiatrist, but was mandatory to be a psychoanalyst. [Pl.Ex. 3 ¶ 5]. When a student enrolled in the Division of Psychoanalytic Training, analysis was a requirement. [Pl.Ex. 3 ¶ 6]. DeMasi's psychoanalysis with Dr. Ingram began in 1985 [7] and continued while DeMasi was a resident at Lenox Hill Hospital and later while he was assigned to Danbury Hospital in 1986. From July 1 through

7. DeMasi's first training analyst at the Psychoanalytic Division was Esther Greenbaum. [Pl.Ex. 16 at 33–66; Pl.Ex. 82].

October 31, 1996, DeMasi was assigned to a rotation at the Danbury Hospital Outpatient Department. [Pl.Ex. 72–75]. The Danbury Hospital master on call schedule reflects that, as part of his residency requirements, DeMasi was also periodically on call. [Pl.Ex. 72].

DeMasi testified that his training analysis by a NYMC faculty member was "supposed to be like any other therapy, confidential; yet on the other hand, they have to certify that I continue this analytic process. And furthermore, I—I learned later that there was some talk about particular individuals and problems that I had discussed in analysis." [Pl.Ex. 9 at 63]. He further testified that in early 1986 Dr. "Ingram made it clear that he was obligated by law to report suspicion of child abuse." [Pl.Ex. 9 at 64].

*The Disclosure*

In May 1986, during a training analysis session, DeMasi disclosed to Dr. Ingram that DeMasi was a pedophile.[8] [Pl.Ex. 17 at 137]. Dr. Ingram recalled DeMasi had returned from a trip to South America.

> That in fact he had in mind in going to South America ... that he would be interested in children ... but perhaps he would find a little girl.
>
> And he wanted me to know that he loved children, he loved to take care of them, he wanted the best for them, but he also had very strong sexual feelings towards them. It was at this point that for me the room began to spin.
>
> And he went on and he described how it wasn't so very important whether they were little boys or little girls, but that it was very important to him and that he saw it as his right and the right of pedophiles everywhere to engage in this behavior.
>
> And as I am hearing this in this session I am [thinking] about my two little boys and I am thinking about how he was a child psychiatrist and he was with children all the time, and I was thinking about how very smart he is, he is a smart man, and how his intelligence is organized around getting what he wants and not letting anything stand in his way.

[Pl.Ex. 17 at 152–53]. Dr. Ingram testified that,

> at no time then or subsequently was I able to find out from [DeMasi] if he ever did anything actually. But I know that this was something that he cared about as deeply as anybody could care about anything. And I knew that I had an obligation to society and to children everywhere. And also, paradoxically, to him.

[Pl.Ex. 17 at 154]. Whether DeMasi had engaged in pedophilic activity, Dr. Ingram stated, "I was very uncertain what to believe ... [s]o when he says 'not really', or when he slides away from the question, I [didn't] know how to understand that." [Pl.Ex. 17 at 162, 166]. Dr. Ingram further testified:

> He was now talking to me about what mattered to him most ... [i]t was now clear that his training was organized around the function, around the purpose of his pedophilic impulse ... [h]e loved children. And being a child psychiatrist that he would be in the company of children.

[Pl.Ex. 17 at 170].

"At the time of the disclosure ...," Dr. Ingram said, "I virtually reeled with amazement at the horror of this and at what I was now engaged with, and what I would need to do." [Pl.Ex. 17 148–49]. DeMasi was the first pedophile that Dr. Ingram had ever treated. [Pl.Ex. 18 at 322–324].

After this disclosure, Dr. Ingram determined that psychoanalysis was not appropriate for treating DeMasi's pedophilia. [Pl.Ex. 18 at 143]. Dr. Ingram testified that,

> One would not treat a pedophile, particularly a pedophile with an insistent wish about pedophilia who argues—who argued then that pedophilia was acceptable. It would not be acceptable to treat such a man in psychoanalytic treatment of any kind.

[Pl.Ex. 17 at 144]. "[I]t was precisely because he wasn't struggling with it that I had the problem I did. He wasn't struggling with it. He was struggling with society

8. Defendant provided the following definition for the criteria for diagnosing pedophilia. "The act or fantasy of engaging in sexual activity with prepubertal children is a repeatedly preferred or exclusive method of achieving sexual excitement." [Doc. # 223 at 3].

which regarded it as an abomination." [Pl. Ex. 17 at 161].

Dr. Ingram testified that he told DeMasi that he could not "consider himself a psychoanalytic candidate, because he [was] not adequately struggling with these impulses." [Pl.Ex. 18 at 264]. Dr. Ingram never advised DeMasi to resign from the Psychoanalytic Division or his residency rotation at Danbury Hospital. [Pl.Ex. 18 at 264]. Dr. Ingram did not inform NYMC of his decision to cease psychoanalytic training sessions and to treat DeMasi with psychotherapy.

*Division of Psychoanalytic Training at NYMC*

The Psychoanalytic Division of NYMC is a division of the Department of Psychiatry at NYMC. [Pl.Ex. 79, 80]. A resident's decision to enter the Division of Psychoanalytic Training is voluntary. Among its four requirements for graduation and certification as a psychoanalyst, NYMC required "successful" or "satisfactory personal analysis." [Pl.Ex. 79 at 5, 8]. At NYMC, "psychiatric residents who are matriculated in the Division of Psychoanalytic Training are entitled to their personal analysis at a reduced fee." [Pl.Ex. 79 at 9]. The reduced fee arrangement was negotiated between the faculty member and NYMC. [Pl.Ex. 5 at 125–26].

Dr. Freedman, Chairman of the Department of Psychiatry at NYMC, appointed Dr. Babikian s the Psychoanalytic Director as well as Director of the Residency Program. [Ex. 7 at 20].

First year candidates were required to begin personal analysis with a member of the Faculty of the Division of Psychoanalytic Training by November 1 of the first academic year, each student choosing his personal analyst and supervisors from the entire faculty roster. [Pl.Ex. 79 at 4]. The candidate was required to attend analysis three times per week; if he failed to attend analysis as required, "the analyst would drop him, and then he would be dropped from the ... institute." [Pl.Ex. 5 at 128, 131–32].

The Division of Psychoanalytic Training had no full-time faculty. "All the psychoanalytic faculty are analysts who practice, but they devote a certain amount of time for teaching and that makes them clinical faculty or voluntary faculty...." [Pl.Ex. 5 at 124].

The Psychoanalytic Division brochure explains that,

personal analysis with a training analyst of the Division of Psychoanalytic Training is a most important and essential aspect of the candidate's training. Often referred to as a "training analysis" or "didactic analysis" in the past, the personal analysis, to be successful, must of necessity be a therapeutic analysis as well. The student is expected to approach his analysis as a patient and to understand intellectually and emotionally his personal development, his relationship with the significant people of his past and present, and his psychodynamic style of life. He is expected to "work through" his conflicts and "blind spots" so that he can grow, not only as a therapist, but individually and as a member of the psychoanalytic community....

[Pl.Ex. 79 at 5]. "Analytic Supervision work may begin when the personal analysis has progressed to the point where the candidate has acquired emotional self-understanding to permit intensive work with patients." [Pl. Ex. 79].

Dr. Alfred Freedman, Chairman of the Department of Psychiatry at NYMC, described the purpose of the requirement for candidates [9] in the psychoanalytic program.

The purpose of—a training analysis as these were—would be to gain awareness of their own psyche; and comprehension of their interpersonal relations; their development of their life; and, their inter-relationships with work, other people, career; their aspirations.

Q: Towards what end?

A: For the—so that they would be better able to treat patients successfully.

[Pl.Ex. 7 at 27]. Faculty members assigned to the Division of Psychoanalysis provided training analysis to the candidates in the psychoanalytic division. [Pl.Ex. 7 at 29–30]. Dr. Babikian stated that the purpose of the training analysis,

9. Both Dr. Babikian and Dr. Freedman referred to psychoanalytic residents as "candidates" and not "residents" or "patients." [Pl.Ex. 7 at 56, Ex. 8 at 136].

a little philosophical. It's the basis of training; however, it's part of the training. The purpose is that the analy[zed], the candidate, will come to know himself better so he will be better able to deal with this counter transference to patients and, therefore, be a better analyst.

Q. Is there any other reason"

A. Not that I know of.

[Pl.Ex. 8 at 136].

Plaintiff's expert witness, Dr. Arthur Henry Green, testified that when he underwent training in psychoanalysis, he understood that,

training analysis was, on the one hand, an opportunity for the candidate to understand more about his or her inner life, psychological motivations, to try to put together the candidate's early development with later psychological problems, to achieve a certain amount of personal growth, greater self knowledge of strengths, weaknesses, and basically served as a self—to increase the powers of self observation so that all of these newly gained qualities could be applied to his practice with other patients.

[Pl.Ex. 39 at 23].

In 1985–86, there was no Committee at the Division of Psychoanalytic Training to monitor a candidate's training analysis. [Pl.Ex. 8 at 144]. Instead, in 1985–86, NYMC relied exclusively on "the word of the analyst." "If the analyst says [the candidate is] ready to be, to graduate or to finish his analysis, that's what you say, that's it." [Pl.Ex. 8 at 145]. In 1985–86, NYMC's faculty training analysts were not required to give progress reports, [Pl.Ex. 8 at 148], but were responsible for documenting the hours that the candidate was in training analysis. [Pl.Ex. 8 at 151].

The American Psychoanalytic Association required in 1986 "minimal standards" for the Training of Physicians in Psychoanalysis as follows:

(B) Suitability for Psychoanalytic Education In addition to the formal requirements, the applicant must present evidence of integrity of character, maturity of personality, reasonable evidence of analyzability and some indication of clinical aptitude. Evaluation of the capacity for psychoana-

lytic education will be carried out through interviews with members of the faculty, supplemented by such additional studies and examinations as are deemed necessary.

The training analysis aims to relieve the candidate of those psychological symptoms and character traits which may interfere with psychoanalytic work in any of its aspects. The faculty of the institute, through observation of the candidate's work in seminars, supervised analyses and case presentations, must ascertain that this goal has been achieved. This does not call for perfection, but a *candidate's residual problems must not suggest hazards, either to the patient or the candidate.*

[Pl.Ex. 130 at 4–5 (emphasis added) ].

Dr. Green opined that the expectation of confidentiality in training analysis is "not complete" but "qualified".

It would be a qualified yes, as I didn't have absolute confidence, but I had confidence that by and large what I was saying would be held confidential. But I also understood that it would be possible that if I would divulge certain problems or conflicts which would have precluded me from acting effectively as a future psychoanalyst, that something—that there may have been some communication from my training analyst to the Analytic Center, because I knew that in many cases, some of the— some of my colleague candidates had throughout—in the first couple of years in our training, were asked to leave the training program. Those—those trainees apparently, to my knowledge, did perform fairly well in the classroom work, so I would assume that something would have come up in their own analysis, which—a discovery of some kind of problem which probably their analysts would have conveyed to the committee, and that would be a reason for their being asked to leave.

[Pl.Ex. 39 at 26–27].

[I]n my institute at that time, there were frequent conferences between the Academic Committee, the Training Committee and the Progression Committees.

So that if a candidate was doing poorly— lets say major problems would have oc-

curred, would have surfaced in the training analysis, the analyst in some cases would report this to the Training Committee, basically feeling that, well, at this point maybe the analyst needed some time off, or the prospective analyst, or maybe the candidate really was not suitable. After a certain amount of self exploration and probing, factors may have ... become evident which would have precluded this candidate from becoming an effective analyst.

[Pl.Ex. 39 at 24–25].

Dr. Green testified he considered his training analysis

bona fide psychoanalytic treatment, but I was aware that since I was also in the dual position of being a candidate, and that in order to practice my intended profession of being a psychoanalyst, I realized that there were certain standards that would apply differently to me as a training analyst—as a candidate in psychoanalytic treatment than as if I were a non-candidate and just was in treatment—was in psychoanalysis with someone else with no regard to a training program. So I perceived a difference.

[Pl.Ex. 39 at 28].

Dr. Arcuni, Director of the NYMC Residency Program at Danbury Hospital, testified that if, in Dr. Ingram's judgment,

he felt that [DeMasi's disclosure of pedophilia] put DeMasi's patients at risk or harm, he was obligated to bring this to the attention of the training director [at NYMC].

[Pl.Ex. 110 96–97].

By letter dated August 12, 1986, Dr. Alfred M. Freedman, Professor and Chairman of NYMC's Department of Psychiatry wrote, "[i]t gives me particular pleasure to recommend Joseph Rick DeMasi for consideration for Fellowship in Child Psychiatry." [Pl.Ex. ——].

By letter dated September 3, 1986, Dr. Babikian informed DeMasi that he was promoted to the third year at the Division of Psychoanalytic Training. [Pl.Ex. 21]. In 1985–86, promotion of candidates was determined at faculty meetings. At the meeting, faculty would "discuss each candidate, his attendance at class, in the class work. And based on that, they either promote him or

don't promote him." [Pl.Ex. 5 at 131]. Although the content of the training analysis was "never" divulged, it was incumbent upon the faculty analyst to report whether the candidate was attending analytic training and fulfilling his analysis requirement. [Pl.Ex. 5 at 132]. Dr. Ingram would have attended meetings to determine whether to promote Dr. DeMasi. [Pl.Ex. 5 at 132]. Dr. Babikian testified that he never received a report from Dr. Ingram that analytic training with De-Masi had ended in May 1986, or that DeMasi was failing to fulfill the analytic training requirement. [Pl.Ex. 5 at 132–33].

On September 17, 1986, Denny Almonte's parents took the ten year old to Danbury Hospital's Emergency Room for psychiatric treatment. There Denny came under the care and treatment of Dr. DeMasi. After his initial visit, Denny Almonte returned for out patient therapy at DeMasi's suggestion. Between September 17 and October 20, 1986, Denny Almonte saw DeMasi at the hospital six times. [Pl.Ex. 2]. On three or four visits, DeMasi sexually assaulted Denny during psychiatric play therapy sessions DeMasi called "hide and seek". [Pl.Ex. 2].

Three of plaintiff's experts Drs. Beck, Schmidt and Green opined that DeMasi departed from the standard of care for psychiatric residents by sexually assaulting Denny Almonte. [Pl.Ex. 69, 90–93].

DeMasi did not meet with Dr. Ingram in August; he met with Dr. Ingram twice in September 1986. [Pl.Ex. 18 at 241].

By letter to Dr. Babikian, dated September 30, 1986, DeMasi requested "continuation in the Psychoanalytic division as a non-matriculated student." The "[r]eason for this is that I do not want to conflict with the requirements of the Division. I am currently in therapy only once weekly. Although I am attempting to make a thrice-weekly arrangement workable, I'd be relieved to continue now with non-matriculated status." [Pl.Ex. 24].

DeMasi completed his rotation at Danbury Hospital on October 31, 1986, and was arrested on or about November 11, 1986.

## DISCUSSION

### A. Dr. Ingram

#### 1. Existence of an Agency Relationship

NYMC argues that, because Dr. Ingram was an independent contractor and not an agent, NYMC cannot be held liable for Dr. Ingram's alleged negligence. NYMC argues that, if anything, it had "a mere incidental connection to the relationship between Ingram and DeMasi." [Doc. # 194 at 52].

■ "The existence of an agency relationship is a question of fact." *Beckenstein v. Potter and Carrier, Inc.*, 191 Conn. 120, 133, 464 A.2d 6 (1983) (multiple citations omitted). "Connecticut courts have long recognized a distinction between employees or agents and independent contractors with respect to imposing vicarious liability on the employer." *Menzie v. Windham Community Memorial Hospital*, 774 F.Supp. 91, 94 (D.Conn.1991) (multiple citations omitted). " 'Agency' is defined as the 'fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act....' " *Beckenstein*, 191 Conn. at 132, 464 A.2d 6 (citing Restatement (Second), 1 Agency § 1). Accordingly, plaintiff must prove three elements to show the existence of an agency relationship: "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Id.* at 133, 464 A.2d 6.

■ An "independent contractor", on the other hand, is "one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer, except as to the result of his work." *Panaro v. Electrolux*, 208 Conn. 589, 604, 545 A.2d 1086 (1988) (citation omitted). The "fundamental distinction between an employee and an independent contractor depends upon the existence or nonexistence of the right to control the means and method of

work." *Id.* 208 Conn. at 603, 545 A.2d 1086 (quoting *Spring v. Constantino*, 168 Conn. 563, 573, 362 A.2d 871 (1975)).

■ Defendant contends the record establishes that Dr. Ingram acted as an independent contractor.[10] First, "therapy sessions between Dr. Ingram and DeMasi were strictly private psychiatrist-patient therapy over which NYMC had absolutely no control." [Doc. # 194 at 51–2]. Second, DeMasi paid Dr. Ingram directly and NYMC derived no financial benefit. Third, the sessions were held at Dr. Ingram's private office and NYMC had no right to direct or control Dr. Ingram's sessions with DeMasi. NYMC further argues that psychiatrists and psychoanalysts, by nature, exert independent control of their professional affairs. Finally, NYMC argues that Dr. Ingram's sessions with DeMasi "had no relation" to Dr. Ingram's function as a faculty member of NYMC, but were "voluntary private sessions."

■ Plaintiff proffers sufficient opposing evidence to establish that whether Dr. Ingram is an agent of NYMC is a disputed issue of material fact. First, plaintiff points out that when Dr. Ingram was appointed by NYMC to its faculty, he was hired to provide training analysis to NYMC residents in the psychoanalytic division. "An essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal." *Beckenstein*, 191 Conn. at 133, 464 A.2d 6. As a training analyst, Dr. Ingram was required to disclose to NYMC,

(A) whether the candidate was undergoing the personal psychoanalysis required by the Division of Psychoanalytic Training.

(B) whether the candidate was prepared to take on analysis of his own patients, and

[C] whether the candidate was prepared for certification as a psychoanalyst.

[Pl.Ex. 81 at 12]. Clearly, DeMasi's training analysis was offered because of the faculty appointment and through NYMC's Division of Psychoanalytic Training.

10. NYMC relied on several factors listed in the Second Restatement of Agency, such as "whether the alleged principal has the right to direct and control the work of the agent; whether the agent is engaged in a distinct occupation; whether the

principal or the agent supplies the instrumentalities, tool, and the place of work and the method of paying the agent." *See Beckenstein*, 191 Conn. at 133, 464 A.2d 6 (citing Restatement (Second) 1 Agency §§ 14, 220).

In return for providing training analysis, Dr. Ingram entered into a financial arrangement by which the candidate paid a reduced rate for the training analysis and Dr. Ingram received "a steady flow of patients. If you like doing this work, that's an advantage." [Pl.Ex. 17 at 139]. Plaintiff further argues that Dr. Ingram, as a condition of his appointment to the NYMC faculty, was required to give up all other appointments to faculty positions at other universities. Dr. Ingram was required to abide by the educational schedule and criteria set by NYMC to determine DeMasi's fitness to matriculate each year.

Accordingly, summary judgment is **DENIED** as to the defense that Dr. Ingram was not acting as an agent of NYMC.

### 2. *Respondeat Superior*

NYMC alternatively argues that it is not vicariously liable for Dr. Ingram's alleged negligence because Dr. Ingram was acting outside the scope of his alleged employment with NYMC when he provided private therapy sessions to DeMasi. Under Connecticut law, a master may be held liable "for the willful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business." *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 500–01, 656 A.2d 1009 (1995).

NYMC first argues that the lack of an employment, master/servant relationship with Dr. Ingram precludes liability. Defendant further argues that "the therapy sessions were not in any form a part of Dr. Ingram's function as a faculty member at NYMC." This Court has already found that a "jury could find, based on the evidence, that Dr. Ingram, in his capacity as DeMasi's training analyst, had feasible and not unreasonably burdensome mechanisms for control available to him." [Doc. # 282 at 14 (citations and quotation marks omitted)]. As discussed above, the Court finds that this is an issue of fact for the jury and thus, summary judgment is **DENIED**.

### B. *DeMasi*

#### 1. *Existence of an Agency Relationship*

NYMC similarly argues that DeMasi was not an agent of NYMC when he was a resident in the Division of Psychoanalytic training. NYMC contends that it "had no control over DeMasi's methods and means of work" because (1) DeMasi came in contact with Almonte while in the employment of Danbury Hospital [11]; (2) Danbury paid DeMasi's salary, provided room and board and controlled his schedule and patients; and (3) NYMC's sole function was to place DeMasi in a residency rotation at Danbury. [Doc. # 194 at 53–54].

Again, plaintiff has presented sufficient evidence in opposition to summary judgment to raise a material issue of fact for the jury. Plaintiff argues that DeMasi, as a resident rotating in a residency program and psychoanalytic division, was subject to the rules and regulations of NYMC. DeMasi was required to abide by the educational schedule, academic criteria and rotation schedule set by NYMC to progress in his training. Indeed, plaintiff argues the obvious, that DeMasi could not have been a psychiatric resident without the NYMC residency program. As a resident, DeMasi was expected to act independently during rotations within an evaluation system structured and controlled by NYMC. Indeed the stated purpose for forming a "Training Consortium" was "to bring together in a partnership the comprehensive resources and staff of these institutions to share their training opportunities under the umbrella of the Department of Psychiatry of New York Medical College." [Pl.Ex. 65 at 2].

Accordingly, summary judgment is **DENIED**.

#### 2. *Respondeat Superior*

NYMC argues that it cannot be held liable because DeMasi acted outside the scope of his employment when he sexually abused plaintiff.

---

11. At a conference held September 2, 1998, NYMC withdrew its contention that DeMasi was moonlighting when he came into contact with Denny Almonte in September and October 1986.

"The doctrine of respondeat superior rests on common law agency principles of vicarious liability." *Nutt v. Norwich Roman Catholic Diocese*, 921 F.Supp. 66, 70 (D.Conn.1995). Under the doctrine of respondeat superior, a master may be held liable "for the willful torts of his servant committed within the scope of the servant's employment and in furtherance of his master's business." *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 500–01, 656 A.2d 1009 (1995); Restatement (Second) of Agency §§ 1, at 7, § 219, at 481.

Ordinarily, it is a question of fact as to whether a wilful tort of the servant has occurred within the scope of the servant's employment and was done to further his master's business. But there are occasional cases where a servant's digression from duty is so clear-cut that the disposition of the case becomes a matter of law.

*A–G Foods, Inc. v. Pepperidge Farm, Inc.*, 216 Conn. 200, 207, 579 A.2d 69 (1990). "The doctrine of respondeat superior focuses on the employee's conduct rather than on the employer's knowledge or approval of the conduct." *Nutt*, 921 F.Supp. at 70 (citation omitted).

NYMC seeks judgment as a matter of law, arguing that "DeMasi's criminal sexual abuse of Almonte was clearly outside the scope of his employment and did not further NYMC's business." Defendant cites Connecticut cases where courts were willing to find, as a matter of law, that sexual abuse by employees is outside the scope of employment. *Id.* 921 F.Supp. at 71 ("sexually abusive conduct amounts to the abandonment of the churches' business."); *Gutierrez v. Thorne*, 13 Conn.App. 493, 499, 537 A.2d 527 (Conn.App.1988) (employee was not furthering the defendant's business interests when he sexually assaulted plaintiff). Several courts of other states have made similar findings. *See* Doc. # 235 at 19–20 (and cases cited therein).

There is nothing in the record to indicate that the sexual abuse of Denny Almonte was motivated by any purpose or object that would serve NYMC. As a matter of law, therefore, DeMasi's sexual abuse of Almonte cannot be said to have furthered NYMC's business and it was outside the scope of employment. Accordingly, the Court **GRANTS** NYMC's motion for summary judgment on Count Three, on NYMC's defense of respondeat superior.

### 3. Superseding Acts

Plaintiff also seeks to base NYMC's liability upon allegations of negligence which flow not solely from DeMasi's conduct, but also from the defendant's acts or omissions. In Count One, plaintiff alleges that NYMC negligently promoted DeMasi.[12]

NYMC argues that "DeMasi's criminal and intentional conduct was a superseding intervening cause of Almonte's injuries, and thus, breaks any causal link between NYMC's alleged negligent behavior and plaintiff's injuries." [Doc. # 194 at 36]. Specifically, NYMC argues that the Court cannot find that the act of placing DeMasi at Danbury Hospital ... was the proximate cause of Mr. Almonte's injuries. [Doc. # 235 at 42]. The Court agrees.

"The test of proximate cause is whether the defendant's conduct is a 'substantial factor' in producing the plaintiff's injury." *Chylinski v. Wal–Mart*, No. 97–9444(L), 97–9498(XAP), 150 F.3d 214, 1998 WL 413902, *3 (2d Cir. July 24, 1998). The Connecticut Supreme Court recognizes that the question of proximate cause is entwined with the question of foreseeability.

The "substantial factor" test, in truth, reflects the inquiry fundamental to all proximate cause questions; that is, whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence.

*Doe v. Manheimer*, 212 Conn. 748, 758, 563 A.2d 699 (1989) (citations omitted). Thus, "[i]n order to determine whether a defendant's conduct is the proximate cause of an injury, it is also necessary to determine whether the harm caused is within the foreseeable scope of the risk created by the

---

12. The Court does not address the claim that DeMasi's sexual assault was a superseding cause in the context of Dr. Ingram's failure to warn, alleged in Count Four, as it is not presented in NYMC's motion for summary judgment.

defendant's conduct." *Chylinski*, 150 F.3d at 217–18.

■ Connecticut has adopted the rule set forth in section 442B of the Restatement (Second) of Torts:

[W]here the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, *except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.*

*Id.* 150 F.3d at 217–18, 1998 WL 413902, *3–4 (emphasis added) (citing *Stewart*, 234 Conn. at 607–08, 662 A.2d at 759 (quoting Restatement (Second) of Torts S 442B (1965)); *see also Doe v. Manheimer*, 212 Conn. at 759, 563 A.2d 699).

■ Defendant argues that summary judgment should be granted as to plaintiff's claim of negligent promotion because the sexual assault was a superseding intervening cause of Denny Almonte's injuries which relieves NYMC of any liability. First, there is no evidence that Dr. Babikian knew, or had reason to know, that DeMasi was a pedophile or would engage in such crimes as he did. Nor is there any evidence that Dr. Arcuni or Dr. Chalko, other supervisory staff, knew or had reason to know of DeMasi's disclosure to Dr. Ingram or that promoting DeMasi would lead to a sexual assault. There is no evidence in the record of complaints, indications or evidence of pedophilia prior to November 11, 1986, when DeMasi was arrested. Nor, NYMC argues, do DeMasi's performance reviews, prior to DeMasi's rotation at Danbury Hospital, "remotely suggest[ ] anything other than administrative and interpersonal problems." Plaintiff does not dispute these facts.

■ The critical distinction here, however, is the claim that NYMC, through its agents, negligently promoted DeMasi despite his poor performance reviews, versus the claim that DeMasi was negligently promoted by NYMC when its agent, Dr. Ingram, knew that DeMasi was dangerous. As to the first claim, summary judgment is **GRANTED** because it is undisputed that making the promotion despite poor performance reviews

was not a substantial factor in causing harm to Denny Almonte. Summary Judgment is **DENIED,** however, as to the claim that DeMasi was negligently promoted despite the knowledge of Dr. Ingram, as an agent of NYMC, that DeMasi was dangerous once DeMasi disclosed his pedophilia in May 1986. No other person at NYMC is claimed to have known either that DeMasi was dangerous, or that DeMasi was a pedophile.

Accordingly, summary judgment is **partially GRANTED** as to Count One in accordance with this ruling.

### 4. *Count Two: Breach of Contract*

In Count Two, plaintiff alleges he is a third party beneficiary of the Affiliation Agreement between NYMC and Danbury Hospital and, as a result, brings a breach of contact action against NYMC. Plaintiff contends that NYMC "promised to provide adequately trained and capable medical residents to Danbury Hospital in order to provide adequate medical services to the Danbury community." *See* Doc. # 230 at 48; Second Amend. Compl. at ¶¶ 41–43. A hospital patient, plaintiff concludes, is a third-party beneficiary where the parties agree to provide health care to a hospital's patients.

As a preliminary matter, the Court must determine which state's law applies to this cause of action. A federal court sitting in diversity must follow the choice of law principles of the forum state. *See Economu v. Borg–Warner Corp.*, 652 F.Supp. 1242, 1246 (D.Conn.), *aff'd.* 829 F.2d 311 (2d Cir.1987) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); *Almonte v. New York Medical College*, 851 F.Supp. 34, 39 (D.Conn.1994). Thus, Connecticut choice of law principles apply.

■ NYMC and Danbury Hospital agreed that the Affiliation Agreement "shall be construed in accordance with the laws of the State of New York." [Pl.Ex. 66 at 3]. Connecticut courts honor the parties' selection of governing law and apply the law of the state specified in the contract. *Gannett Co., Inc. v. Register Publishing Co.*, 428 F.Supp. 818, 824 (D.Conn.1977); *Pollak v.*

*Danbury Mfg. Co.,* 103 Conn. 553, 557, 131 A. 426 (1925). Accordingly, the Court applies New York law for third-party beneficiaries.

There is no question that the provision of medical care and education of physicians are "interdependent." [Pl.Ex. at 66]. Indeed, the Affiliation Agreement acknowledges that NYMC and Danbury "share a common set of goals." The question presented is whether patients of Danbury Hospital, such as Denny Almonte, who are consumers of the interdependent services provided by NYMC and Danbury through their affiliation are third-party beneficiaries under New York law.

 The party claiming to be a third-party beneficiary has the burden of demonstrating that he has an enforceable right. *Airco Alloys Division, Airco Inc. v. Niagara Mohawk Power Corp.,* 430 N.Y.S.2d 179, 186, 76 A.D.2d 68, 79 (N.Y.App.Div.1980) (citation omitted). Plaintiff has failed to demonstrate that he is a third party beneficiary to the Affiliation Agreement. First, "[t]o be a third-party beneficiary, the claimant must show an intent of the parties to an agreement to benefit the claimant." *Benedictine Hospital v. Hospital Underwriters Mutual Ins. Co.,* 481 N.Y.S.2d 813, 816, 103 A.D.2d 553, 556 (N.Y.App.Div.1984) (citation omitted). The contract does not designate or specifically refer to plaintiff or generally "patients of Danbury Hospital" as third party beneficiaries. Almonte is "neither the promisee nor the one to whom performance is to be rendered." *Airco Alloys Div., Airco, Inc.,* 430 N.Y.S.2d at 185, 76 A.D.2d at 78 (multiple citations omitted). Rather, the Agreement addresses the creation of a union of NYMC and Danbury Hospital as a mutually beneficial relationship created for a common purpose. Second, the Court does not find, within the four corners of the Agreement, any intent by the parties to provide a benefit to the patients of Danbury or Denny Almonte. "[B]efore a third party can enforce a contract in his favor it must clearly appear that the contract was made and intended for his benefit ... the agreement under which the third party claims must clearly express an intention to assume a duty directly to him." *Ultra Scope Int'l v. Extebank* 599 N.Y.S.2d 361, 366, 158 Misc.2d 117, 124–25 (N.Y.Sup.Ct.1992), *aff'd,* 598 N.Y.S.2d 699, 192 A.D.2d 479 (1993) (citations omitted).

Instead, the Court finds that the Agreement was formed to create a relationship between NYMC and Danbury Hospital, benefitting the two parties to the Agreement. "The intent to benefit a third party must be shown and the benefit must not be merely incidental but immediate to such a degree as to indicate the assumption of a duty to make reparation if the benefit is lost." *Airco Alloys Div., Airco, Inc.,* 430 N.Y.S.2d at 185, 76 A.D.2d at 78 (multiple citations omitted). Here, the benefit derived from the NYMC/Danbury union is best characterized as an incidental benefit to Almonte. "Absent such intent, the third party is merely an incidental beneficiary with no right to enforce the contract." *Id.* 430 N.Y.S.2d at 185, 76 A.D.2d at 78 (multiple citations omitted).

Accordingly, summary judgment is **GRANTED** as to Count Two.

### CONCLUSION

Accordingly, NYMC's Motion for Summary Judgment [**Doc. # 194**] is **GRANTED** as to Count One in part, Counts Two and Three and **DENIED** as to Count Four.